UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT LONDON

DEMETRIUS HILL,                          |
                                         |
        Plaintiff,                       |          Civil Action No. 09-CV-07-KSF
                                         |
v.                                       |
                                         |
HARLEY LAPPIN, *et al*.,                 |          **MEMORANDUM OPINION**
                                         |               **AND ORDER**
        Defendants.                      |

***** ***** ***** *****

On January 13, 2009, plaintiff Demetrius Hill, proceeding without counsel, filed this civil rights action asserting constitutional claims under 28 U.S.C. § 1331, pursuant to the doctrine set forth in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).  Hill alleged that officials at the United States Penitentiary-McCreary in Pine Knot, Kentucky violated his First Amendment rights by retaliating against him because he filed a grievance.  [R. 2]

Defendants James Huff, Tom Sheldrake, and Shawn Burchett filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment.  [R. 58]  Hill filed a response entitled "Motion in Opposition to Defendants' Motion to Dismiss" [R. 64] to which the defendants replied.  [R. 66] The Court has reviewed the records and the arguments made by the parties, and will grant the defendants' motion to dismiss this proceeding for the reasons explained below.

### BACKGROUND

Hill has been in the custody of the Bureau of Prisons ("BOP") since September 2002, but was confined in USP-McCreary for only nine months between June 11, 2008, and March 23, 2009. Before that, Hill was confined at the United States Penitentiary in Lewisburg, Pennsylvania.  Hill alleged that while confined at USP-Lewisburg, numerous officials physically assaulted him, covered

up the assault, spread rumors in the inmate population that he was a government informant, and placed him in the Special Management Unit ("SMU").[1]  [R. 2, p. 2, ¶ 4]

On September 27, 2008, several USP-McCreary inmates became involved in a fight in the prison recreation yard.  In his complaint, Hill alleges that BOP officers Huff and Burchett conducted a "fictitious" investigation of him to link him to the fight; submitted a report concluding that Hill instigated the fight; placed him in the prison's Segregated Housing Unit ("SHU") where he remained until March 23, 2009; and recommended that he be transferred to the SMU at USP-Lewisburg knowing that a dangerous and brutal environment existed there.  Hill alleges Huff and Burchett took these disciplinary actions against him to retaliate for filing a grievance alleging that Huff was abusive.  Hill further alleged that Huff and Assistant Warden McLeod told him that he was going to be transferred because "they didn't need the paper-work up here." [*Id*., p. 3 ¶ 8]  Hill demanded unspecified damages and an injunction preventing his transfer to USP-Lewisburg.

The defendants, by counsel, have moved to dismiss Hill's claims.  [R. 58]  To the extent that the defendants have submitted documents beyond the initial pleadings in the complaint, they alternatively seek summary judgment under Federal Rule of Civil Procedure 56.  The defendants dispute Hill's claims that they investigated him, ordered his prolonged confinement in SHU, and

---

[1]  Hill claims that the SMU "does not exist in the national policy."  To the contrary, BOP Program Statement 5217.01, *Special Management Units* (November 19, 2008) explains that the SMU is a special housing and programming unit through which the BOP manages inmates who have "participated in or had a leadership role in geographical group/gang-related activity," and who "present unique security and management concerns. Accordingly, the Bureau of Prisons (Bureau) designates inmates to SMUs where greater management of their interaction is necessary to ensure the safety, security, or orderly operation of Bureau facilities, or protection of the public." [R. 58-3 Exh. B]  The SMU program consists of four progressive levels, each differentiated by the degree of inmate interaction allowed, the amount of personal property the inmate is permitted to possess, and the programming the inmate must complete.  PS 5217.01, pp. 7-10.  Inmates are expected to complete the SMU program within eighteen to twenty-four months.  *Id*. at pp. 10-11.

2

recommended him for SMU placement in retaliation for filing grievances at USP-McCreary. The defendants contend that Burchett had sufficient grounds to investigate Hill in connection with the recreation yard fight given Hill's documented affiliation with a prison gang and his disruptive conduct at USP-McCreary and other BOP facilities. The defendants assert that, based on Burchett's interviews with other inmates and staff members who witnessed the recreation yard fight, Burchett properly concluded that Hill had encouraged or incited the fight and had thus committed a serious disciplinary violation, and that Huff appropriately reviewed and approved Burchett's findings.

The defendants also argue that Hill's gang leadership position and his history of disruptive institutional behavior justified their decisions to keep Hill confined in segregation for the remainder of the time that he was incarcerated at USP-McCreary and to begin the process to designate him for placement in a SMU. They emphasize that they merely recommended Hill for SMU confinement in the early stages of the SMU designation process, and that the final decision to place Hill in a SMU was made by other higher-level BOP officials after the initial request for referral was reviewed and Hill was afforded a due process hearing.

The defendants also clarify that Hill was designated to the SMU in the Federal Correctional Institution in Talledega, Alabama, not the one located in USP-Lewisburg as Hill had alleged in his complaint. The defendants state that Hill's behavior in Talledega continued to be seriously disruptive and that Hill incurred numerous disciplinary incident reports while confined there, causing FCI-Talledega officials to subsequently transfer him to the SMU in USP-Lewisburg. The defendants emphasize that they had no involvement in the decision to transfer Hill to USP-Lewisburg. The defendants argue that in light of these facts, Hill has failed to state a First Amendment retaliation claim against them in their individual capacities.

3

The defendants also contend that they were unaware of any clearly-established law which constitutionally prohibited them from internally investigating Hill's misconduct, issuing findings based on existing facts and information, and taking the appropriate disciplinary measures. Accordingly, the defendants argue that they are entitled to qualified immunity.

In his response, Hill claims that genuine issues of fact exist and contends the fact that the defendants acted shortly after he filed his grievances supports an inference that they did so in retaliation for his constitutionally protected conduct. [R. 64, p. 8] First, Hill alleges that prior to the recreation yard fight, Defendant Huff knew he was a member of the Bloods gang and had placed him on "Red Card" status whereby he was required to "check in" with a staff member every two hours while he was in the general population. Hill claims that after the recreation yard incident occurred, the defendants used his gang membership and obtained statements from unknown sources to manufacture "false investigative reports" establishing that he had been involved with and/or played a leadership role in the fight. Hill further disputes Burchett's statement that Hill had been observed "speaking to a gathering of Bloods before the fight occurred." [R. 64, p. 5, referring to Burchett Declaration, R. 58-4, ¶ 8] On that issue, Hill accused Burchett of intentionally lying.

Second, Hill argues that other inmates were initially placed in SHU in connection with the recreation yard incident, but because none of them had filed lawsuits or submitted grievances charging USP-McCreary officials of abusive behavior, all of those prisoners were eventually released back to the general population and none of them were referred to a SMU. Hill states that two inmates who were involved in the recreation yard fight were neither kept in SHU for a prolonged period nor referred to a SMU, and that hundreds of other USP-McCreary prisoners had more serious and lengthier disciplinary records than he had, but were not referred for SMU confinement. Hill

4

alleges that Sheldrake colluded with Huff and Burchett by directing Hill's Case Manager to prepare a packet recommending that Hill be transferred to a SMU facility.

Third, Hill alleges that all of the other prisoners involved in the fight in the recreation yard were found guilty of disciplinary violations stemming from the incident.[2]   Hill notes that while he was never charged with or found guilty of any misconduct -- physical or otherwise -- stemming from the incident, he was nevertheless kept in SHU for a prolonged period and was later referred to a SMU.   He reiterates that the defendants retaliated against him because he had filed six grievances against USP-McCreary staff members and several "high profile" lawsuits against the BOP which had received media coverage both before and during his confinement at USP-McCreary.   Hill claims that Huff and McLeod told him he was going to be transferred because " they didn't need the paperwork up here."   [R. 64, p. 8][3]

Hill also submitted the affidavits of two former USP-McCreary inmates, Jeremy Brown and Shaheem Johnson.   In his affidavit, Johnson states that he knew all of the prisoners involved in the recreation yard incident, and that Hill had no physical or verbal altercations with any other prisoner.   [R. 64-2, p.1, ¶ 2]   He states that after the incident, he spoke to Burchett about Hill returning to the general population and "was told to speak to SIA Huff and A.W. McLeod because they wanted him transferred since he kept filing complaints about staff."   [R. 64-2, p.1, ¶ 2]   Johnson further states

---

[2]   Hill makes this allegation notwithstanding his complaint that the BOP refused to provide him with the names of all of the prisoners involved, rendering the factual foundation for this allegation unclear.

[3]   On July 3, 2012, the Court granted the defendants' amended motion to dismiss the constitutional claims against Defendant Ron McLeod, former Assistant Warden of USP-McCreary, for failure to serve McLeod within the 120-day period prescribed by Federal Rule of Civil Procedure 4(m).   [R. 57]

5

that Huff personally told him that he had warned  Hill to stop filing BP-9's on staff, "but he keeps doing this s\*\*t, so I am getting out of here,"[4] and that Hill would not have him "in the funny papers like New York."  [*Id*., ¶ 2]

Brown's affidavit states he knew Hill had no physical or verbal altercations with any other prisoner during the incident [R. 64-2, p.1, ¶ 2] and that while he was in the SHU recreation yard doing rounds, he overheard Huff tell Hill that "he [Hill] was being transferred and got everyone on board with the decision at the SHU meeting."[5]  [*Id*., p. 4]  Brown also said that "A.W. McCloud" -- presumably referring to USP-McCreary Assistant Warden Ron McLeod -- told Hill that the Warden had retired, that they were transferring him, and that "[they] did not need the damn paperwork that you (Hill) were warned to stop filing."  [*Id*., p. 2, 6]

Fourth, Hill argues that the defendants concocted the recreation yard investigation and manufactured reports to justify a SMU referral in retaliation for the grievances he filed.  He further alleges that the criteria for SMU placement was vague [R. 64, p. 3]; that the defendants knew once they began the process of referring him to SMU, the hearing officer would automatically recommend SMU placement to the BOP Regional Director and the Designation and Sentence Computation Center ("DSCC"); and that the BOP Regional Director and DSCC would summarily approve and "rubber stamp" the referral issued at the institutional level.  Hill stated the defendants "cannot point

---

[4]  The statement Johnson attributes to Huff is confusing and  appears to be missing a word or words.  Presumably, Johnson intended to allege that Huff stated he would be getting *Hill* -- not himself -- out of USP-McCreary.

[5]  Brown's statement also appears to be missing a word or words.  Presumably, Brown intended to allege that Huff told Hill that he had "got everyone on board" with the decision to transfer Hill.

to a single prisoner recommended for SMU that the SMU hearing officer <u>did not</u> approve, and the same is true of the Regional Director and DSCC." [R. 64, p. 4, (emphasis in original)]

Fifth, Hill argues that the defendants are not shielded by qualified immunity. Hill contends that he had a clearly established First Amendment right to file grievances and lawsuits against the BOP. He contends that from September 27, 2008, through the remainder of his confinement in USP-McCreary, the defendants violated that clearly established right by retaliating against him for engaging in that constitutionally protected conduct by "falsely" investigating him in connection with the recreation yard fight, keeping him in the SHU for six months, and then recommending his transfer from USP-McCreary and referral to a SMU.

In their reply, the defendants argue that no genuine issue of fact remains for trial because Hill has offered nothing more than self-serving, conclusory allegations of retaliatory action. [R. 66] The defendants argue that they have presented substantial documentary evidence establishing that they had a non-retaliatory motive for transferring Hill, namely his history of disruptive behavior, leadership role in a prison gang, and his actions inciting the recreation yard fight. They contend that Hill presented only his own unsupported and conclusory allegation in response to their evidence showing a non-retaliatory basis for disciplining him. Finally, the defendants question the validity of the signatures and the dates on the affidavits of Shaheem Johnson and Jeremy Brown, noting significant variations between the signatures on the affidavit copies filed with the Court, mailed to their counsel, and filed by Brown in another proceeding before this Court.

## DISCUSSION

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A

prisoner retains First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). To establish a First Amendment retaliation claim, the plaintiff must prove that: (1) the plaintiff engaged in activities protected by the Constitution or statute; (2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was taken at least in part because of the exercise of the protected conduct. The plaintiff has the burden of proof on all three elements. *See, e.g., Murray v. Evert*, 84 F. App'x 553, 556 (6th Cir. 2003); *Green v. Tudor*, 685 F. Supp. 2d 678, 692 (W.D. Mich. 2010).

Moreover, the plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001). If the plaintiff is able to make such a showing, the defendant then has the burden of showing that the same action would have been taken even absent the plaintiff's protected conduct. *Smith*, 250 F.3d at 1037; *Thaddeus-X*, 175 F.3d at 399.

Hill has not met his burden with respect to proving the first element of a First Amendment retaliation claim -- that he was engaged in constitutionally protected conduct. An inmate has a First Amendment right to file grievances against prison officials, but that right is protected only if the grievances are not frivolous. *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2010). "Depriving someone of a frivolous claim ... deprives him of nothing at all, except perhaps the punishment of Federal Rule of Civil Procedure 11 sanctions." *Lewis v. Casey*, 518 U.S. 343, 353 (1996); *White-Bey*

8

*v. Griggs*, 43 F. App'x 792, 794 (6th Cir. 2002);*Wade-Berry v. Fluery*, 2008 WL 2714450, at *6 (W.D. Mich. July 8, 2008).

Hill alleged in his response to the defendants' motion to dismiss that he filed **six** grievances at USP-McCreary prior to the September 27, 2008 recreation yard fight; that in one of those grievances, he complained about Huff's abusive conduct toward him; and that the defendants used the recreation yard fight as a pretext to discipline him in retaliation for the six grievances he had filed. Hill's allegation that he filed six grievances is, however, contradicted by what he alleged in his complaint filed on January 13, 2009, in which Hill stated twice in one paragraph that he had filed "a" complaint against Huff. [R. 1, p. 3, ¶ 8] "A" complaint indicates the filing of a single complaint or grievance, not six. Even assuming that Hill, in fact, filed six grievances prior to the recreation yard incident, he has neither described nor produced any documentary evidence which would enable the Court to determine whether they were non-frivolous.

In April 2009, the Court screened Hill's complaint and, on its own, dismissed it at that time for failure to state a claim upon which relief could be granted. [R. 9 & 10] Hill appealed, and on December 28, 2010, the Sixth Circuit reversed and remanded, stating "Whether the grievances [which Hill filed] are frivolous cannot presently be determined because there are no details about those grievances beyond Hill's allegations." *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010). Despite the Sixth Circuit's clear signal that proof as to the precise nature of Hill's grievances could be dispositive of his retaliation claim at a later date, Hill offered no proof in the record that his grievances were non-frivolous in nature, which is a requirement for a prisoner alleging that he was engaged in constitutionally protected behavior during the grievance process. *Lewis*, 518 U.S. at 353. Hill had the burden of proving all three elements of his retaliation claim, which included showing

9

that the conduct in which he was engaged was constitutionally protected conduct.  *Murray*, 84 F. App'x at 556; *Green*, 685 F. Supp. 2d at 692.

Hill states in his response only that the six grievances he filed against Huff and/or other prison staff stemmed from "U.S.P. McCreary staff abuse, misconduct and dereliction of duty," [R. 64, p. 5, ¶ 8], but he provided no factual details or further information about the "staff abuse, misconduct and dereliction of duty."  Hill obtained from the BOP a list of remedy requests he filed at various BOP facilities, including USP-McCreary. [R. 64-2, pp. 1- 5]  That list merely shows the remedy numbers, Hill's name and BOP register number, the dates on which Hill filed the remedies, and the dates on which those remedies were closed.  [*Id*.]  That list does not provide any details about the underlying nature of Hill's grievances, a fact that someone -- presumably Hill -- acknowledged in a hand written notation at the bottom of the BOP's cover memorandum. [R. 64-2, p. 1]

Lacking anything specific from Hill, his grievance(s) alleging "abusive" behavior by Huff or other prison officials could have been based on mere verbal abuse, which, though not condoned, cannot be the basis of a constitutional violation, *Ivey v. Wilson*, 832 F.2d 951, 954-55 (6th Cir. 1987).  If Hill only complained of verbal abuse in his grievance(s), the grievances were frivolous. *See Scott v. Kilcherman*, 230 F.3d 1359 (6th Cir. 2000) (unpublished table decision) (holding that prisoner's grievance regarding verbal abuse was frivolous and not protected by the First Amendment, because "[a]n inmate has no constitutionally protected right to be free from verbal abuse.").

Similarly, Hill's statement that he filed grievances regarding staff "misconduct" or "dereliction of duty" [R. 64, p. 5, ¶ 8] does not allege or establish that such grievances were non-frivolous.  To the contrary, similar types of grievances, like an inmate's complaint that he dislikes

his cell mate, have been held not to constitute a non-frivolous grievance. *Porter v. Howard*, No. 11-cv-12317, 2012 WL 3263778, at *4 (E.D. Mich. Aug. 9, 2012). Other examples of complaints about prison officials' conduct and/or prison conditions which have been determined to be frivolous can be found in *Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008) (because prisoner's insulting, profane, and derogatory verbal comments to prison officials violated state law stating that insolence by prisoners is grounds for disciplinary action, the prisoner's conduct was not considered "protected" under *Thaddeus-X*); *Zeigler v. State of Michigan*, 990 F. App'x 808, 810 (6th Cir. 2004) (finding that because prisoner's grievance complaining about a pat-down search was frivolous, he failed to establish that he was engaged in protected conduct for purposes of a retaliation claim); *Thaddeus–X v. Love*, 215 F.3d 1327, 2000 WL 712354, at *3 (6th Cir. May 22, 2000) (unpublished table decision) (holding that when prisoner threatened to file a grievance against a prison official because the official was eating food at the prison guard desk, he was not engaged in protected First Amendment conduct; accordingly, the defendant had not retaliated against the prisoner by filing a major misconduct report against him).

In *Antonelli v. Rios*, No. 06-283-GFVT, 2009 WL 790171 (E.D. Ky. March 24, 2009), prisoner Michael C. Antonelli alleged that federal prison officials had retaliated against him for filing grievances in which he complained that he had been punished for (a) assisting other inmates with filing their grievances, and (b) accusing federal prison officials of violating state law. *Id*. at *1. This Court granted summary judgment in favor of the defendants on the retaliation claim, finding that both of Antonelli's grievances were substantively meritless and frivolous. Accordingly, Antonelli had not been engaged in constitutionally protected conduct under *Lewis* when he filed either of them. *Id*. at *6-7.

11

Hill cannot remain silent as to the nature of his grievances in the face of a motion for summary judgment, as the Court is not required to speculate as to whether they were non-frivolous to support a retaliation claim.  The Sixth Circuit has affirmed the dismissal of a retaliation claim where the prisoner "did not describe any of the grievances preceding Eckman's decision [to move the prisoner to a non-smoking unit] and thus did not show that the grievances were non-frivolous." *Smith v. Craven*, 61 F. App'x 159, 162 (6th Cir. 2003).  Another district court granted summary judgment against a prisoner-plaintiff who failed to offer any proof as to the nature of his grievances upon which he relied in asserting a First Amendment retaliation claim.  *See Sweet v. Boyd*, No. 407-cv-00484-MP, 2010 WL 940360, at *1 (N.D. Fla. March 12, 2010) ("Plaintiff states that he wrote over 20 grievances on Defendant Boyd.  He has provided none of these to this Court."). Further, as the defendants correctly note, "An inmate cannot immunize himself from adverse administrative action by prison officials merely by filing grievances and then claiming that everything that happens to him is retaliatory ... [i]f that were so, then every prisoner could obtain review of non-cognizable claims merely by filing a lawsuit or grievance and then perpetually claiming retaliation." *Antonelli*, 2009 WL 790171, at *7 (quoting *Reinholz v. Campbell*, 64 F.Supp.2d 721, 733-34 (W.D. Tenn. 1999)).

While on the one hand *pro se* litigants are entitled to some degree of leniency, Hill on the other hand is a practiced prison litigator.  According to the federal judiciary's electronic database (PACER), Hill has filed forty (40) civil actions in district courts throughout the country and has succeeded in having three district court decisions reversed and remanded (one at the Sixth Circuit Court of Appeals and two at the Fourth Circuit Court of Appeals).  Hill therefore knew or should

12

have known that he could not rely on conclusory assertions in order to survive a summary judgment motion in a First Amendment retaliation case.

"While a prisoner has every right to resolve legitimate disagreements with prison staff through the prison's grievance process, his use of the same process as a weapon against staff members based upon frivolous allegations is not constitutionally-protected conduct which can support a retaliation claim." *Antonelli*, 2009 WL 790171, at * 6.  Hill's broad retaliation allegations warranted his claims going forward at the initial screening stage, *see Hill*, 630 F.3d at 472-76, but at the summary judgment stage, Hill has not carried his burden of proving that his grievances were non-frivolous and thus protected by the First Amendment.

As Hill has not established that he was engaged in constitutionally protected conduct, Hill's retaliation claim fails as a matter of law and analysis of the second and third elements of a retaliation claim is unnecessary.  Even if the Court were to assume otherwise, and were to further conclude that Hill engaged in constitutionally protected conduct and that Huff took action against him motivated at least in part because of it[6] -- the defendants may still avoid liability by showing "that [they] would

---

6   In his complaint, Hill alleged that he filed a grievance against Huff just before the recreation yard incident.  [R. 2, p. 3 ¶ 8]  In both his complaint and his response to the defendants' motion to dismiss, Hill alleged that Huff told him he would be transferred "because they didn't need the paper-work up here."  [R. 2, p. 3 ¶ 8; R. 64, p. 8]  The Court construes "paperwork" to mean inmate grievances.

Hill also alleged in his complaint that Huff told him he (Huff) would personally prepare the report and "pass it off to Bruchette [sic] to ensure Plaintiff would be shipped."  [R. 2, p. 3, ¶ 8]  This allegation is at odds with the declarations of Huff and Burchett, both of whom explain that Huff, the Supervisor of Special Investigative Services at USP-McCreary, was Burchett's superior, not the other way around.  Both explain that it was Burchett -- not Huff -- who investigated the recreation yard fight and prepared the report recommending that Hill remain in SHU, and that it was Huff -- not Burchett -- who later approved the report and disciplinary recommendations.

(continued...)

have taken the same action in the absence of the protected activity." *Whiteside v. Parrish*, 387 F.

App'x 608, 612 (6th Cir. 2010) (quoting *Thaddeus–X*, 175 F.3d at 399); *Jones v. Smolinski*, 2010

WL 7370364, at *6 (W.D. Mich. Aug. 31, 2010).

The defendants have shown just that. An inmate may be considered for SMU designation

if he meets any one of the following criteria: participated in a disruptive gang/geographic group

activity; had a leadership role in disruptive gang/geographic group-related activity; had a history of

serious and/or disruptive disciplinary infractions; committed any 100-level prohibited act after being

classified as a member of a Disruptive Group; participated in, organized, or facilitated any group

misconduct which adversely affected the orderly operation of a correctional facility; or otherwise

participated in or was associated with activity such that the greater management of the inmate's

---

(...continued)

Hill does not allege that Burchett and Sheldrake personally told him that they were retaliating against him because he had filed grievances at USP and/or numerous lawsuits against the BOP. Hill alleged Burchett knew that, by issuing a report finding him responsible for the recreation yard fight and recommending that he remain in the SHU, Hill would ultimately be transferred to a SMU facility. Hill also alleged Sheldrake knew that if he approved the Unit Team's SMU packet and recommended SMU placement to higher-level officials at USP-McCreary, all subsequent BOP officials, including those at USP-McCreary, the BOP's Regional Office, the DSCC, and the BOP's Central Office, would automatically "rubber stamp" approval to transfer Hill to the SMU.

Hill can only speculate as to what Burchett and Sheldrake "knew" would happen after they took disciplinary measures against him. While summary judgment may be inappropriate in cases in which a defendant's state of mind -- such as intent or motive -- is at issue, *see Helwig v. Pennington*, 30 F. App'x 516, 518 (6th Cir. 2002), summary judgment is appropriate if the nonmoving party "rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Picha v. City of Parma*, 1992 WL 57419, at *2 (6th Cir. Mar. 25, 1992) (table decision) (*quoting Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)); *see also Automotive Support Group, LLC v. Hightower*, 2012 WL 5351588, at *9 (6th Cir. Oct. 31, 2012). Hill's claims against Burchett and Sheldrake, based on speculation and conclusory statements of retaliatory motive, are insufficient at the summary judgment stage. *Picha*, 1992 WL 57419, at *2; *Medina-Munoz*, 896 F.2d at 8.

14

interaction with others is necessary to ensure the safety, security, or orderly operation of BOP facilities.  [R. 58-3 (BOP Program Statement 5217.01, p. 2, § 2 "Referral Criteria")]

In their declarations, Huff, Burchett, and Sheldrake explain that Hill had a lengthy history of disruptive institutional behavior within the BOP; that Hill was the leader of the East Coast faction of the "Bloods" prison gang; that the East and West Coast factions of that gang were fighting each other; that on September 27, 2008, staff members and other inmates observed Hill and another inmate talking to a group of inmates who immediately erupted into a physical fight; that Hill had likely been one of two instigators of the recreation yard fight; that Hill should remain in SHU custody; and that his return to the general population could cause further disputes and violence among the Bloods as demonstrated by the recreation yard fight.  [R. 58-4 (Burchett Declaration), p. 3 ¶ 5; pp. 5-6, ¶¶ 8-9); R. 58-5 (Huff Declaration), p. 4-5, ¶¶ 8-9]

Burchett states that while Hill was confined in SHU, he continued to engage in serious misconduct; that multiple disciplinary incident reports were filed against him; and that because of his misconduct while in the SHU, Hill was kept there until his transfer to FCI-Talledega.  [R. 58-4, pp. 3-4; ¶ 6]  Huff states that while Hill was confined in the SHU at USP-McCreary, staff had to use calculated force "to safely gain control of the Plaintiff and extract him from his cell," [R. 58-5, p. 4, ¶ 6] and that even after Hill was transferred to the SMU in Talledega Florida, he continued to engage in disruptive behavior and was transferred to yet another SMU at USP-Lewisburg.  [*Id.*, p. 4, ¶ 7]  Sheldrake states in his declaration that when he received Hill's Unit Team's SMU packet, he approved it because he determined that, based Hill's lengthy disciplinary history of violent offenses, documented membership in and leadership of a faction of a fractious prison gang, and probable role in instigating the prison fight on September 27, 2008, Hill qualified for placement in

a SMU. [R. 58-7, p. 2, ¶ 2]  Sheldrake then forwarded the packet and his recommendation to Assistant Warden Ron McLeod for further institutional consideration and review.

Given Hill's repeated negative institutional conduct and the defendants' investigatory findings indicating that Hill had likely incited or been involved in the recreation yard fight, Huff, Burchett and Sheldrake have offered neutral and non-retaliatory grounds for their actions.  The defendants have explained that they took disciplinary steps against Hill to maintain the security and orderly running of the prison and to prevent future fights or other disturbances in the general population.  They have also explained that they had no role whatsoever in the decision to transfer Hill from the SMU at FCI-Talledega to the SMU at USP-Lewisburg.  The defendants have established legitimate and non-retaliatory reasons for the disciplinary actions they took against Hill and have demonstrated that they would have taken the same disciplinary steps against Hill even if he had not filed grievances prior to September 27, 2008.

By arguing otherwise, Hill asks this Court to second-guess penological decisions the defendants made regarding the safety and security of inmates and staff and the institution in general, simply because he had previously filed grievances.  But courts afford federal prison administrators wide discretion as to their decisions concerning security issues.  *Still v. Wilkinson*, 2000 WL 1177444 at *1 (N.D. Ohio March 31, 2000).  Avoiding potential danger within the prison and maintaining safety are penological objectives which "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."  *Jones v. North Carolina*

16

*Prisoners' Labor Union, Inc.*, 433 U.S. 119, 127 (1977); *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979); *Ward v. Dyke*, 58 F.3d 271, 273 (6th Cir. 1995).

Nothing in the record supports Hill's conclusory allegation that the actions taken by Burchett, Huff, and Sheldrake following the fight in the recreation yard were unwarranted in light of the information they collected as part of their investigation or his past or present institution misconduct. To maintain institutional security, Huff approved Burchett's recommendation that Hill remain confined in the SHU, and Sheldrake approved the Unit Team's recommendation that Hill be designated to a SMU facility for better monitoring. The defendants are entitled to deference as to decisions made to preserve internal order, discipline, and institutional security.

The two affidavits Hill submitted from former USP-McCreary inmates Shaheem Johnson and Jeremy Brown warrant brief discussion. Johnson states that Huff told him (Johnson) that he (Huff) warned Hill to stop filing BP-9's on staff, that Hill kept "doing this s**t," and that "I am getting out of here." [R. 64-2 (Johnson Affidavit), p. 14, ¶ 4] Reading his affidavit in context, the only sensible interpretation of Johnson's statement is that Huff told Johnson that he intended to get *Hill* -- not himself (Huff) -- "out of here," meaning transferred from USP-McCreary to another prison. This statement, offered for the truth of the matter asserted, constitutes hearsay, which is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter." Fed. R. Evid. 801(c). Johnson is not testifying at trial, and his written statement is hearsay and will not be considered. *Cf. Dawson v. Norwood*, No. 1:06-CV-914, 2011 WL 2667962, at *3 (W.D. Mich. July 5, 2011) (holding that affidavits of other inmates recounting statements allegedly made by defendant correctional officers as to their intent to retaliate constitute inadmissible hearsay).

17

Further, Johnson's testimony does not constitute a present sense impression because it was not made while, or immediately after, the conversation he allegedly had with Huff concerning Hill. *See* Fed. R. Evid. 803(1). Johnson did not state on what date his alleged conversation with Huff transpired, but the term "*getting* out of here" (as opposed to "*got* him out of here") indicates that at time of the alleged conversation between Johnson and Huff, Hill's transfer was an event planned for the future, which in turn means that Huff made his alleged statement to Johnson while Hill was still confined at USP-McCreary. Hill was transferred from USP-McCreary to FCI-Talladega on March 23, 2009. Therefore, Huff would have had to make his alleged statement to Johnson on or before March 23, 2009. Johnson's affidavit is dated "30 September 2011." [R. 64-2, p. 15] The original typewritten year on that affidavit is unclear because someone hand-wrote over the printed text causing the year to read "2011." [*Id.*] Even so, it is evident that Johnson did not sign his affidavit contemporaneously with the alleged conversation he described which, even if true, necessarily must have occurred at USP-McCreary on or before March 23, 2009.

Affiant Jeremy Brown offers two statements. First, he states that "A.W. McCloud [sic] told Mr. Hill that the Warden had retired and they were transferring him and that '[they] did not need the damn paperwork that you (Hill) were warned to stop filing.'" [R. 64-2, p. 17, ¶ 6] Second, Brown states that while he was in the SHU recreation yard, he overheard Huff tell Hill that he was "being transferred" and that "everyone got on board with the decision at the SHU meeting." [*Id.*, p. 16, ¶ 4] Brown does not allege whether he personally heard McLeod make his statement about the reason for Hill's transfer or whether he learned about it secondhand from someone else. Even had Brown identified the source of his information, the statement which he attributes to McLeod likewise constitutes hearsay as a statement made by another offered for the truth of the matter asserted under

18

FRE 803.   Further, Brown failed to state on what dates McLeod and Huff made their alleged statements, but in quoting both of them, Brown used the terms "were transferring him [Hill]," (as to McLeod) and "being transferred" (as to Huff).  This wording strongly indicates that Hill's transfer had not yet occurred, and that McLeod and Huff made their alleged statements about Hill's transfer *prior to* Hill's transfer on March 23, 2009.

Brown's statements also do not survive under the exception to the hearsay rule for present sense impressions because they were not made while, or immediately after, McLeod and Huff made their alleged statements.   Fed. R. Evid. 803(1).  Brown's affidavit is dated "14 September 2010." [*Id*., p. 17]  The original typewritten year in that affidavit was "2012," but someone hand-wrote over the printed text and changed the year to "2010." [*Id*.].   Whether Brown signed his affidavit on September 14, 2010, or September 14, 2012, he did not sign it contemporaneously with the alleged conversations he described which, even if true,  necessarily must have occurred at USP-McCreary prior to Hill's transfer on March 23, 2009.   Because the statements contained in Johnson and Brown's affidavits constitute hearsay, they carry no weight in addressing Hill's response to the defendants' motion for summary judgment.

Hill's request for injunctive relief will be denied as moot because he has been transferred to USP-Lewisburg. For the reasons set forth above, the defendants are entitled to judgment in their favor on Hill's retaliation claim, and their motion for summary judgment will be granted.

**CONCLUSION**

Accordingly, **IT IS ORDERED** as follows:

1.      The Motion to Dismiss filed by defendants Shawn Burchett, James Huff, and Thomas Sheldrake [R.58] is **DENIED**; the Motion for Summary Judgment filed by defendants Shawn Burchett, James Huff, and Thomas Sheldrake [R. 58] is **GRANTED**.

2.      Plaintiff Demetrius Hill's "Motion in Opposition to the Defendants' Motion to Dismiss" [R. 64] is **DENIED**.

3.      The Court will enter an appropriate judgment.

4.      This action is **STRICKEN** from the docket of the Court.

This November 27, 2012.

**Signed By:**

**_Karl S. Forester_** $KSF$

**United States Senior Judge**